MATRIX CONTRAST CORPORATION et al. v. KELLAR.

District Court, E. D. New York. September 7, 1929.

No. 3588.

Duell, Dunn & Anderson, of New York City (Holland S. Duell and David A. Woodcock, both of New York City, of counsel), for plaintiffs.

Frank A. Bower, of New York City, for defendant.

CAMPBELL, District Judge. This is an action in equity for the alleged infringement of patent No. 1,466,437, issued to Percy L. Hill, deceased, by James W. Anderson, as administrator of the estate of Percy L. Hill, for process for making character carriers for composing machines, granted August 28, 1923, original application filed August 12, 1919, divisional application filed February 5, 1923.

The plaintiffs are Matrix Contrast Corporation, as licensee, and James W. Anderson, as administrator of the estate of Percy L. Hill, deceased, patentee. The defendant is an individual who has interposed an answer, setting up the twofold defense of invalidity and noninfringement.

The line-casting machine art, to which the patent in suit applies, is to-day represented by the Mergenthaler linotype machine, which came on the market 40 years ago, and the intertype machine, which appeared about 12 years ago.

In operating a linotype machine, the operator sits facing a keyboard, which has superficial resemblance to the keyboard of a typewriter. When he strikes a key, one of the matrices having a corresponding letter is released from the magazine and drops down a channel to a conveyor belt, which carries it to a point where a star wheel cam throws the matrix to an assembler or assembling box. The operator similarly brings down the matrices for the other letters and for large spaces between lines, and all are grouped in the assembler. The length of the printed line is positively fixed, and the operator often finds the line unfilled after he has put in all the words and syllables which the line will contain. His remedy is to touch a key, which will bring down one or more thin spaces, until the warning bell or his own observation shows him that the line is full. To prevent leaving the large space at the end of the line, the operator distributes the spaces at intervals throughout the line.

The operator does, when he observes errors and on other occasions, change the location of matrices by hand. The magazines are limited to 90 characters, or less, and the operator is frequently called on to use extra characters, called "side sorts," which he picks by hand from an unclassified tray, called a "pi-tray," or "pi-stacker," which may contain 30 or more different characters or side sorts.

Errors are of frequent occurrence and very costly, and a great saving can be made if the operator can readily observe an error when the matrices are in the assembling box, before the slugs are cast. It is unnecessary to go into detail as to the methods of discovering and correcting errors, it being sufficient to say that the error can best be prevented, and the expense saved, by making it possible for the operator to easily observe what characters are represented by the matrices brought down.

For 30 years the only assistance which was given to the operator was the indentation of a small character in the narrow edge of the matrix, and the provision of an artificial light with a reflecting shield, which directed its beam at the line of matrices in the assembler. The matrices are brass, and because of their use the indentations become filled with grease, the surrounding surfaces discolored and dirty, causing them to look alike. To overcome this, the matrices were cleaned with cleaning fluids, producing a greater evil on a glittering surface, which reflected light rays into the eyes of the operators, with disastrous results to the eyes of the operators, due to eye strain.

The problem which confronted Hill was: (1) To reduce the glare of artificial light reflected from the brass matrices as they stood in the assembler box. (2) To make the matrices legible in such a way that there can be simultaneous verification of an entire line of matrices.

The purposes of the invention are fully set forth in the specification of the patent in suit. The instant suit is based on both claims of the patent in suit, which read as follows:

"1. The process of coloring a light colored metallic matrix adapted for line casting machines and having on its edge an indented indicating character, said process including treating said edge including said indicating character to make the same dark or black and thereafter filling in the indented indicating character with a lighter colored or white pigment.

"2. The process of coloring a light colored metallic matrix adapted for line-casting machines and having on its edge an indented indicating character, said process including treating said edge including said indicating character to deaden the light reflecting quality thereof and also to make the same dark or black, and thereafter filling in the indented indicating character with a pigment of high light reflecting quality and contrasting sharply in color with the resultant treated edge."

█ Defendant offered no evidence of prior ase, and only offered two prior art patents alleged as anticipations:

Patent No. 965,155, issued to George W. Clarke, for matrix-plate, granted July 26, 1910. This patent does not concern the art of linotype or intertype machines. The operation is described in the specification of the patent as follows:

"In operating this system, the matrix plates are not distributed like type, but are spread out indiscriminately on an operating table. This table should preferably be arranged so that the matrix plates 1, 2, 3, by which nearly all the work is done, are kept separate from the other matrix plates which are rarely used. The operator selects the proper matrix plate for each letter by the color, and places them in his left hand, one behind the other, for the proper sequence of letters to form a word. When the matrices of the words of a line have been thus arranged, and their matrix plates suitably spaced, a line is cast therefrom."

From this description of the operation, it is clearly shown that it is confined to handwork, with ample opportunity to observe the character represented, with no glare to contend with and to be overcome, and the use of color to identify the characters on the plate. The colors red and yellow, among those mentioned, would not tend to accomplish the important purpose of reducing the glare. The purpose of the use of the color is entirely different from that of the patent in suit.

Patent No. 744,836, issued to Frank W. Weeks, for type, granted November 24, 1903. This patent is not related to the linotype art. It deals entirely with hand operations, the old hand-set type, and not a matrix. There is no glare of the artificial light of a line-casting machine to overcome, no small indented characters on the narrow edge of a matrix to be observed.

The color in this patent is applied only to the indented indicating character, and not to the surrounding surface, on the end of the body opposite the printing face. The object of the invention is to make possible composition by the unskilled, and to relieve from the necessity of taking proofs, and the application is described in the specification as follows:

"The duplicate character is coincident with the printing character, and hence while the printing characters are arranged in reverse face relation, as is usual, the duplicate characters are so arranged as to appear in the relation as when printed upon a sheet, so that the matter composed can be read at a glance from the duplicate characters."

These patents do not anticipate.

The contention of the defendant, that the process of the patent in suit was obvious, and not invention, is a familiar one. Knowledge after the fact is common. The need of the invention is apparent; no one else, by the Hill or any other process, produced the beneficial results during the years since the first linotype machine came on the market; the Hill process solved the problem successfully, from both the humanitarian and commercial standpoint; and there has been general acquiescence during the time since the Hill patent issued.

Even if, as the defendant contends, it was common practice long prior to Hill to darken brass and fill in indented indicating characters with white filler, to show which defendant offered, in addition to the said patents to Clarke and Weeks, pages of Henley's Twentieth Century Book of Receipts, American Encyclopedia of Formulas, and catalogue of Schaeffer & Bundenberg Manufacturing Company of 1913, yet invention may reside in the conception of the idea for remedying defects, and in the valuable result, even though the means for carrying out this

concept be simple and old. Cash Reg. Co. v. Cash Indicator Co., 156 U. S. 502, 514, 515, 15 S. Ct. 434, 39 L. Ed. 511, 515, 516; American Steel Foundries v. Damascus Brake Beam Co. (C. C. A.) 267 F. 574, 576; Tompkins-Hawley-Fuller Co. v. Holden (C. C. A.) 273 F. 424, 435; Wallace v. Noyes (C. C.) 13 F. 172, 180.

There were old and well-known processes for darkening brass surfaces, and there were old and well-known methods for filling indentations with white coloring matter, and these were the means utilized by Hill for reducing the process to practice.

As we have seen, the purpose of the use of colors in the two patents cited was remote from that of the patent in suit. Rottach's use of a black and white process for name plates for scales; the use of a black and white process on thermometers, and the various receipts, formulas, and processes for blackening brass, are all remote.

The value of the Hill invention to the new industry, the fact that no others had transferred the old process to the new art before Hill, and the obstacles apparent to the introduction of the old process to matrices, due to the character of their use, especially the heat and the necessity of not interfering with their movement through the channels, all bring the invention of the patent in suit within the doctrine that it is invention to transfer an old device to a new and nonanalogous art. Potts v. Creager, 155 U. S. 597, 606–608, 15 S. Ct. 194, 39 L. Ed. 275, 278, 279; Smokador Mfg. Co. v. Tubular Products Co. (C. C. A.) 31 F.(2d) 255, 256; Williams v. American String Wrapper Co. (C. C. A.) 86 F. 641.

Nothing more strongly shows that the invention of the patent in suit was not obvious than the fact that for 30 years skilled workmen had suffered from eye strain and as a result a limitation of vision, if not blindness, and the commercial loss due to errors which the operator was unable to correct, and no skilled workman had previously adopted the process of the patent in suit. Potts v. Creager, supra; Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177, 1181; Du Bois v. Kirk, 158 U. S. 58, 63, 15 S. Ct. 729, 39 L. Ed. 895, 898.

All the discussion about formulas for blackening the brass and supplying the white seems to me to be of no moment. The disclosures of the patent in suit were sufficiently explicit to teach the art to use the Hill process, as it is apparent, from the evidence offered by the defendant, that formulas of a satisfactory nature were known to those

skilled in the art. Featheredge Rubber Co. v. Miller Rubber Co. (C. C. A.) 259 F. 565; Thomas A. Edison, Inc., v. Waterbury Battery Co. (C. C. A.) 281 F. 254, affirmed (C. C. A.) 287 F. 320; Radio Corporation of America v. E. J. Edmond & Co. (D. C.) 20 F.(2d) 929; Franc-Strohmenger & Cowan v. Arthur Siegman, Inc. (D. C.) 25 F.(2d) 108, affirmed (C. C. A.) 27 F.(2d) 785; Goldschmidt Thermit Co. v. American Vanadium (D. C.) 291 F. 81.

From the defendant's answers to the plaintiffs' interrogatories, it appears that the process practiced by the defendant was as follows: "Subsequent to the 11th day of August, 1925, and prior to the filing of the bill of complaint herein, I whitened the indicating character of a metallic matrix adapted for line-casting machines, and thereafter darkened the edge of said matrix surrounding said indicating character, as shown in the specimen produced in answer to interrogatory 23."

The answers to the interrogatories further show that the matrix was brass, and had the indicating character indented on the edge of the matrix, as shown in said specimen produced. Under these circumstances, the defendant denies infringement, because it has reversed the steps of the process; by first applying the white and later the black coloring. ▮ There is nothing in the specifications or claims of the Hill patent to indicate any advantage in the order of the steps. The result of preventing glare and making the readability better, for an entire line of matrices, is the aim of the patent in suit, and the result will be as well achieved, regardless of the order of the steps.

Defendant's opinion, that by reversing the steps the pigments held their place a little better, is not supported by any evidence other than his own, and his claim is refuted by a disinterested witness, William L. Bissette, who is a printer on the New York Daily News, where he has seen both plaintiffs' and defendant's processes applied to matrices, and who testified that defendant's colors did not wear as satisfactorily as plaintiffs' colors.

Kellar's order of steps does not serve any better than plaintiffs' order to reduce the glare, or to make the characters more legible. A variation of the order of steps does not avoid infringement. Celluloid Manufg. Co. v. American Zylonite Co. (C. C.) 31 F. 904; New York Filter Manufg. Co. v. Niagara Falls Waterworks Co. (C. C. A.) 80 F. 924; Chadeloid Chemical Co. v. F. W.

513

Thurston Co. (D. C.) 220 F. 685; Los Angeles Lime Co. v. Nye (C. C. A.) 270 F. 155.

Nothing was pointed out in the history of the patent, in its passage through the Patent Office, which operates to estop the plaintiff to claim that his patent covers the process, even if the steps are reversed. The commercial success and the general use of the patent in suit cannot be questioned.

In view of the testimony taken by deposition, of the large number of operators of line-casting machines, it seems to me that this case will be properly decided by following the standard set by Judge Coxe, in O'Rourke Engineering Const. Co. v. McMullen (C. C. A.) 160 F. 933, 938, where he said:

"The principal question in such cases is: Has the patentee added anything of value to the sum of human knowledge; has he made the world's work easier, cheaper, and safer; would the return to the prior art be a retrogression? When the court has answered this question, or these questions, in the affirmative, the effort should be to give the inventor the just reward of the contribution he has made."

The patent is valid and the defendant infringes both claims. A decree may be entered in favor of the plaintiffs against the defendant, with an injunction, accounting, and costs.